UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------------X

VITTORIA SOLLA,

Plaintiff,

-against-                                    **COMPLAINT**

**JURY DEMAND**

BOSTON CHILDREN'S HEALTH PHYSICIANS, LLP,
and GERARD VILLUCCI,

Defendants.

--------------------------------------------------------------------------X

<u>**PRELIMINARY STATEMENT**</u>

1. This case arises from Defendants' egregious violations of federal and state employment laws, including the Americans with Disabilities Act (ADA), the Family and Medical Leave Act (FMLA), and the New York Human Rights Law (NYHRL). Plaintiff Vittoria Solla, a dedicated nurse, was unlawfully terminated on April 26, 2024, just two weeks before she was set to begin FMLA leave to care for her severely immunocompromised father. Defendants attempted to justify this termination by fabricating allegations of racism, an accusation that was never previously documented, investigated, or mentioned in any disciplinary records.

2. Throughout her 25-year career as a nurse, Ms. Solla has maintained an impeccable professional record, free of any allegations of misconduct or discrimination. She has never been accused of racism in any previous employment and has consistently received positive feedback for her ability to provide compassionate and culturally competent care to diverse patient populations.

3. Prior to her termination, Ms. Solla had fully disclosed her caregiving responsibilities to Defendants during her hiring process. Defendants were fully aware that she was the sole caregiver for her father, a liver transplant recipient suffering from multiple serious health conditions, including immunosuppression, atrial fibrillation, pulmonary hypertension, and recurrent cancer. Defendants also knew that Ms. Solla was a single mother raising two young children while balancing full-time employment. Despite this, Defendants repeatedly criticized her for legally protected absences, scrutinized her work performance, and retaliated against her for exercising her rights under the FMLA and ADA.

1

4. In April 2024, Plaintiff was officially approved for FMLA leave, set to begin on May 16, 2024. Just weeks later, Defendants abruptly terminated her employment in a clear act of FMLA interference and retaliation. To justify this unlawful action, Defendants fabricated a baseless claim that Plaintiff was terminated for making racist remarks—a pretext that is entirely unsupported by the record. Defendants never documented any allegations of racism in Plaintiff's personnel file, her six-month performance review contained no reference to racist conduct, and her final written warning, issued on February 14, 2024, also made no mention of such allegations. Even at the time of termination, Defendants failed to cite racism as a reason in her termination letter, which instead stated that they "valued her contributions" and provided Plaintiff with unemployment paperwork, explicitly assuring her that they would not contest her claim, a position entirely inconsistent with terminating her for alleged misconduct.

5. However, once Plaintiff applied for unemployment benefits, Defendants reversed course and falsely reported to the New York Department of Labor (DOL) that she had been terminated for misconduct. The DOL initially denied Plaintiff's claim based on these false statements, but after Defendants failed to provide any supporting evidence and failed to appear at the hearing, an Administrative Law Judge ruled in Plaintiff's favor, confirming that Defendants' allegations were entirely fabricated.

6. Further, Defendants violated federal medical privacy laws by improperly demanding that Plaintiff disclose her father's private medical records as part of her FMLA request. Under 29 C.F.R. § 825.500(g), employers may only require a basic healthcare provider certification, not an employee's family member's private medical records. When Plaintiff objected to this invasion of privacy, Ms. Abreu insisted that providing her father's full medical records was "mandatory," demonstrating Defendants' blatant disregard for federal regulations.

7. The false and defamatory allegations made by Defendants have not only caused severe economic hardship for Ms. Solla, a single mother of two and the primary caregiver for her ailing father but have also inflicted significant emotional distress on both her and her children. Defendants' reckless and retaliatory actions have tarnished her reputation, jeopardized her ability to secure future employment, and subjected her family to unnecessary stress and hardship.

8. This lawsuit seeks to hold Defendants accountable for their unlawful termination, retaliation, discrimination, interference with FMLA rights, and wrongful denial of Plaintiff's legally protected employment benefits. Plaintiff seeks reinstatement, back pay, front pay, compensatory and punitive damages, and any other relief deemed appropriate by this Court.

## JURISDICTION AND VENUE

9.  This action arises from violations of the Americans with Disabilities Act of 1990, the Family Leave Act, and the New York Human Rights Law.

10. This Court has original jurisdiction under 28 U.S.C. §1331, Federal Question, with reference to the Plaintiff's claims under, the ADA, and the FMLA. Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 overall state claims so related, as the state claims form part of the same case or controversy pertaining to Plaintiff's claims under, the ADA, and the FMLA.

11. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §1391, as Defendants conduct business in Westchester County New York and Plaintiff performed work within Defendants' facility in Westchester County New York, and a substantial part of events or omissions giving rise to the claim occurred in Westchester County.

## THE PARTIES

### PLAINTIFF

12. Plaintiff Vittoria Solla ("Plaintiff") or ("Ms. Solla") resides at 33 Fair Way, Mahopac NY, 10541.

### DEFENDANTS

13. Defendant Boston Children's Health Physicians, LLP, ("Defendant Boston Children's Health Physicians") or ("Defendant Boston") is a business entity conducting business in the State of New York at 400 Columbus Ave. #200E, Valhalla, New York 10595.

14. During any period of time whatsoever during the six years immediately preceding the filing of this Complaint, Defendant Boston Children's Health Physicians performed one or more of the following actions: (1) hire the Plaintiff (2) terminate the employment of the Plaintiff (3) set the wage rate of Plaintiff (4) maintain payroll records concerning Plaintiff, or (5) institute work rules for the Plaintiff.

15. Defendant GERARD VILLUCCI ("Defendant Villucci") or ("Mr. Villucci") is the CEO of Defendant Boston, and his regular workplace is 400 Columbus Ave. #200E, Valhalla, New York 10595.

16. During any period of time whatsoever during the six years immediately preceding the filing of this Complaint, Defendant Villucci performed one or more of the following actions: (1) hire the Plaintiff, (2) terminate the employment of the Plaintiff (3) set the wage rate of Plaintiff (4) maintain payroll records concerning Plaintiff, or (5) institute work rules for the Plaintiff.

17. Defendant Boston Children's Health Physicians and Defendant Villucci will hereby be referred to jointly as ("Defendants") unless otherwise noted.

## BACKGROUND FACTS

18. Defendant Boston Children's Health Physicians is a large multi-specialty group with more than 300 clinicians providing care services for newborns, children, and adolescents.

19. Defendants hired Plaintiff as a nurse on April 23, 2023.

20. At all relevant times Defendants employed 15 or more employees at their facility in Valhalla NY.

21. Defendants terminated Plaintiff on April 26, 2024.

22. Plaintiff's job duties included assisting physicians, administering vaccines, conducting telephone triaging, communicating with parents or caregivers about illnesses and medication, checking inventory and ordering supplies.

23. Plaintiff was paid a bi-weekly salary of $3,040.00.

24. Plaintiff's general work schedule was from Monday through Friday, from 8:00 AM to 4:30 PM.

25. Defendants provided Plaintiff Solla with benefits such as medical and dental insurance, 401k benefits, three weeks of vacation, and four personal days a year.

26. Plaintiff received a right-to-sue letter from the EEOC on November 18, 2024. **Ex. 1 2024.11.18 _EEOC Right to Sue_**

## DISABILITY DISCRIMINATION CLAIMS

27. Plaintiff interviewed with Cynthia Abreu or ("Ms. Abreu"), Defendants's office manager, and Dr. Emily Koelsch or ("Dr. Koelsch") in March of 2023 to secure a position as a nurse at Boston Children's Health Physicians of New York and Connecticut. The interview took place at Defendants's Valhalla location in Westchester County New York.

28. During Plaintiff's interview with Ms. Abreu and Dr. Koelsch in March 2023, Plaintiff explicitly disclosed her critical role as the primary caregiver for her father, Palmino Solla (hereinafter "Mr. Solla"), who was recovering from a liver transplant due to end-stage liver disease caused by hepatocellular carcinoma (HCC). As a liver transplant recipient, he was permanently immunocompromised, requiring strict infection control measures to prevent life-threatening complications. **Ex. 2_2021.06.04_Plaintiff's father's diagnosis of liver transplant_**

4

29. Plaintiff informed Defendants that even a minor illness could be fatal for her father due to his weakened immune system. Plaintiff made Defendants fully aware that her father's post-transplant condition, combined with other severe comorbidities including atrial fibrillation, pulmonary hypertension, diabetes, and postoperative complications, required continuous monitoring and caregiving support. **Ex. 2_2021.06.04_Plaintiff's father's diagnosis of liver transplant_**

30. Due to these medical complications, Plaintiff's father was unable to work, perform daily activities independently, or care for himself without assistance. His condition substantially limited major life activities, making him a disabled individual under the Americans with Disabilities Act (ADA).

31. Plaintiff explained to Ms. Abreu and Dr. Koelsch that, as her father's sole caregiver, she was responsible for administering over a dozen critical medications multiple times per day, precisely on schedule, as several of them were immunosuppressants essential to preventing organ rejection. His medication regimen included anticoagulants, anti-rejection drugs, blood pressure stabilizers, antifungal and antibiotic medications, diabetes management injections, and pain control prescriptions, among others. Any missed or delayed dose could have resulted in severe complications, hospitalization, or death. Additionally, Plaintiff was responsible for monitoring his symptoms daily, ensuring he adhered to strict dietary and fluid intake restrictions, managing his frequent doctor's appointments and emergency visits, and maintaining a controlled, sterile environment to prevent exposure to infections. **Ex. 2_2021.06.04_Plaintiff's father's diagnosis of liver transplant_**

32. Plaintiff further emphasized that when her children were sick, her caregiving responsibilities became even more demanding, as she had to completely isolate them from her father to prevent him from contracting even minor illnesses, which could escalate into deadly infections due to his severely compromised immune system. This level of care required constant coordination, vigilance, and immediate action in response to any change in his condition. Defendants were fully aware of these medical realities when they hired Plaintiff, yet later disregarded them and penalized her for fulfilling these responsibilities.

33. During the interview, Plaintiff also disclosed that she was a single mother of two minor children, having separated from her husband due to domestic violence, and currently had a restraining order against him. Plaintiff explicitly stated that when her children were ill, she was required to take extra precautions to quarantine them from her father to protect his fragile health. Plaintiff stressed that her role as his sole caregiver was not discretionary, it was a medical necessity.

34. After being fully informed of Plaintiff's role as the sole caregiver for her severely immunocompromised father, including the strict medication schedule, the need for constant monitoring, and the heightened risk posed by common illnesses, Defendants

explicitly acknowledged her disclosures and proceeded to offer her the nursing position. Plaintiff received a formal job offer with a start date of April 23, 2023, demonstrating that Defendants had full knowledge of her caregiving obligations at the time of hiring and made a deliberate decision to employ her.

35. On May 19, 2023, Plaintiff sent a text message to Dr. Cho, a managing doctor for Defendants. Plaintiff conveyed that she was up all-night vomiting and suffering from diarrhea and a fever. Ms. Solla conveyed to Dr. Cho in the same text message that her son was suffering from the same ailments, Dr. Cho answer: "got it, will let other doctors and HR know. Keep me posted. Hope you and your son feels better" **EX.3_ 2023.05.19_Plaitniff conversation with Dr. Cho about Plaintiff sickness_**

36. On May 21, 2023, Plaintiff sent a follow-up text message to Dr. Cho, notifying him that she was still sick, experiencing fever, diarrhea, and nausea, and that both her minor daughter and her father had now fallen ill with the same infection. Despite being fully aware that Plaintiff's father was at heightened risk of severe complications due to his condition, Dr. Cho responded by pressuring Plaintiff to return to work if she felt even slightly better, rather than acknowledging the serious medical concerns she had raised. **EX.4_ 2023.05.21_Plaitniff conversation with Dr. Cho about Plaintiff's sickness_**

37. In early July, Ms. Solla's father was re-diagnosed with cancer.

38. While Plaintiff was already responsible for coordinating his post-liver transplant care, including daily medication administration, medical monitoring, and doctor's appointments, the new diagnosis of pulmonary nodules suspected for malignancy significantly escalated the intensity and urgency of his medical needs.

39. Medical records confirm that Mr. Solla was a high-risk cancer patient, with a complex medical history including end-stage liver disease, atrial fibrillation, diabetes, hypertension, and a prior liver transplant requiring lifelong immunosuppressive therapy. In May 2023, a CT scan revealed the growth of a pulmonary nodule, increasing the likelihood of metastatic cancer. By October 2023, he required major thoracic surgery, a right lower lobe lung resection, to remove the suspected malignancy. **EX. 5_2023.10.09_ Medical Records of Palmino Solla: Diagnosis of Pulmonary Nodules and Comprehensive Discharge Medication List Demonstrating Intensive Treatment Regimen_**

40. During this time, Plaintiff was under immense emotional and physical strain, balancing full-time employment, sole caregiving responsibilities for her father, and the care of her two minor children. She was required to field frequent calls from his medical providers, coordinate numerous appointments, manage his strict medication regimen, including multiple daily doses of immunosuppressants, anticoagulants, and pain medications, and monitor him closely for signs of organ rejection, infection, or cancer progression. **EX. 5_ 2023.10.09_ Medical Records of Palmino Solla: Diagnosis of Pulmonary Nodules**

**and Comprehensive Discharge Medication List Demonstrating Intensive Treatment Regimen_**

41. Despite Defendants being fully aware of her father's deteriorating health and increased need for intensive caregiving, they offered no accommodations. Instead, Defendants continued to scrutinize Plaintiff's absences, failed to provide support or flexibility, and ultimately penalized her for fulfilling unavoidable family responsibilities.

42. Ms. Solla was also required to bring her father to medical appointments and tend to his needs. For example, on October 9, 2023, Ms. Solla was required to attend her father's Surgery. Ms. Solla's father was in surgery for the removal of a cancerous nodule in his lung. **EX. 5_ 2023.10.09_ Medical Records of Palmino Solla: Diagnosis of Pulmonary Nodules and Comprehensive Discharge Medication List Demonstrating Intensive Treatment Regimen_**

43. On or about October 12, 2023, Ms. Solla's father was discharged from surgery. Ms. Solla worked a half a day that day, to care for her father. This absence was approved by Ms. Abreu, the defendant's office manager.

44. On or about November 2023, Plaintiff received her six-month performance review from Ms. Abreu. The evaluation praised Plaintiff as an excellent employee, highlighting her strong work ethic, thorough completion of tasks before the end of each shift, and exceptional communication skills with patients and their families. Patients frequently expressed their appreciation for Plaintiff's ability to communicate effectively in both English and Spanish, further demonstrating her value to the practice.

45. Despite the positive assessment, Ms. Abreu made a callous and inappropriate remark, stating, "Had we known your home life situation was so bad, Dr. Cho would have reconsidered hiring you." This comment directly implied that Plaintiff's caregiving responsibilities, fully disclosed during the hiring process, were now being viewed as a liability by Defendants.

46. Dr. Cho, who was supposed to be present for the evaluation, was not in attendance, leaving Plaintiff to navigate the meeting alone. This was in stark contrast to the evaluations of her colleagues, which were conducted with multiple individuals present, ensuring fairness and support. Plaintiff signed the review, despite the discriminatory undertones of Ms. Abreu's comments, as she had no opportunity to contest them in the absence of a higher authority.

47. Ms. Abreu also criticized Plaintiff's absenteeism and cell phone usage, disregarding the fact that her absences were related to her father's serious medical condition and were either approved or legally protected under federal and state law. Plaintiff reaffirmed that she was her father's sole caregiver and explained that her phone use was strictly limited to coordinating his medical care, scheduling doctor's appointments, and responding to urgent health concerns.

48. Rather than acknowledging Plaintiff's legitimate concerns or offering any support, Ms. Abreu abruptly ended the conversation in silence, demonstrating an outright refusal to engage in a meaningful discussion or consider reasonable accommodations for Plaintiff's legally protected caregiving responsibilities.

49. On November 14, 2023, Plaintiff was forced to file a police report after her ex-husband violated a court-issued restraining order by sending her harassing and threatening messages through a court-monitored parenting application. The New York State Domestic Incident Report documented that Plaintiff's ex-husband's conduct was in direct violation of a duly served Order of Protection issued by the Putnam County Family Court and that the messages he sent were meant only for communication regarding their children but had escalated into threats and harassment. **EX. 6 2023.10.14_Plaintiff's Police Report_**

50. The report further notes that Plaintiff's ex-husband had a documented history of domestic violence, including physical abuse, and that law enforcement classified his actions as a direct threat to Plaintiff's well-being and the safety of her children. Given the severity of the situation, Plaintiff had no choice but to prioritize her legal rights and personal safety, missing work that day to file the police report and take the necessary legal steps to protect herself and her family. **EX. 6 2023.10.14_Plaintiff's Police Report_**

51. On December 11, 2023, while at work, Plaintiff suffered a severe dental injury when her tooth cracked, leading to a painful infection that required urgent medical attention. The pain became so severe that she was forced to seek emergency dental treatment. Plaintiff was treated by Dr. Cho's husband, a dentist, whom she visited upon Dr. Cho's recommendation. Due to the extent of the infection and necessary treatment, Plaintiff was medically excused from work on December 12 and December 13, 2023. As a result of this emergency, Plaintiff was also unable to attend the Defendants' annual Christmas party on December 15, 2023, further highlighting the serious impact of her condition. **EX. 7 2023.12.11_ Plaintiffs doctors note_**



Figure 1. Dental Excuse Note: Verification of Plaintiff's Excused Absence for Dental Treatment (12/13/23 - 12/15/23)

52. On December 28, 2023, Plaintiff contracted the flu and promptly notified Ms. Abreu via text message that she was too ill to report to work. Despite being contagious and at risk of exposing others, including medically vulnerable patients, Plaintiff was still expected to justify her absence. She provided a doctor's note excusing her from work until she had been fever-free for at least 24 hours, in accordance with standard medical guidelines. **EX. 8_ 2023.12.28_ Plaintiff doctors note_**



Figure 2. Medical Excuse Note: Verification of Plaintiff's Excused Absence Due to Illness (12/28/23)

9

53. On January 29, 2024, Plaintiff's children and father became ill with fever and stomach issues, necessitating her immediate attention as their sole caregiver. Plaintiff requested to leave work early to tend to them. In response, Ms. Abreu dismissed her concerns and instead questioned whether Plaintiff's children could "be alone" with her father until she got home, despite knowing that Plaintiff's father was extremely ill, immunocompromised, and incapable of caring for young children. Plaintiff explained that this was not possible due to his fragile health, but rather than acknowledging this, Ms. Abreu responded indifferently, stating, "If it's urgent and you need to leave and take them to urgent care then that's okay, but it would be helpful if you could work your scheduled hours."

54. Defendants' consistent disregard for Plaintiff's own medical needs, her caregiving responsibilities, and her father's severe condition demonstrates a pattern of unfair treatment and retaliation, wherein Plaintiff was pressured to work despite legitimate medical and family emergencies.

55. On January 31, 2024, Plaintiff was issued a written warning for alleged excessive absenteeism, despite the fact that every single absence was either (1) protected under state or federal law, (2) medically documented, or (3) previously approved by her managers. Defendants ignored these legal protections and prior approvals, instead using Plaintiff's lawful and necessary absences as a pretext for discipline and retaliation.

56. Later that same day, Plaintiff privately confided in Ms. Abreu, explaining that she was experiencing severe stress and anxiety due to the immense pressure of balancing full-time employment with caring for her immunocompromised father and young children. Plaintiff explicitly requested that this conversation remain confidential, as she feared retaliation if her personal struggles were shared with other members of management.

57. However, Ms. Abreu blatantly disregarded Plaintiff's request for confidentiality and, without her consent, disclosed Plaintiff's private health-related concerns to Dr. Cho and Dr. Koelsch. Email correspondence confirms that, even before Plaintiff approached Ms. Abreu, Defendants had already been discussing her personal situation behind closed doors and had predetermined that she should seek therapy, further proving that she was being targeted based on her caregiving responsibilities and emotional distress.

58. Following this, Defendants presented Plaintiff with a blank write-up and pressured her to sign it without providing any details regarding the alleged infractions. Recognizing the unfairness of this demand, Plaintiff refused to sign the document. In response, Defendants stated that she would formally receive the write-up in the coming days, making it clear that her discipline had been pre-decided, further reinforcing the retaliatory nature of their actions. **EX. 9_ 2024.01.31_Ms. Solla´s complaint to Ms. Abreau about private conversation_**

59. Instead of offering support or accommodations, Defendants weaponized Plaintiff's personal disclosures against her. Ms. Abreu not only confirmed that Dr. Cho and Dr. Koelsch had already been discussing her before she sought help, but she also attempted to justify the breach of confidentiality by saying she was sending Plaintiff therapy resources,despite Plaintiff never requesting such assistance. This unilateral decision to involve senior medical personnel in Plaintiff's private matters further contributed to a hostile work environment, violated her right to workplace privacy, and demonstrated Defendants' discriminatory and retaliatory motives. **EX. 9_ 2024.01.31_Ms. Solla´s complaint to Ms. Abreau about private conversation_**

60. Due to that reason, Ms. Solla sent an e-mail to Jacqueline Montesarchio hereinafter ("Ms.Montesarchio ") from Human Resources requesting a confidential meeting to speak about her writeup. **EX. 10_ 2024.01.31_Ms. Solla´s request to have a meeting with Ms. Montesarchio_**

61. In the same meeting, Ms. Solla explicitly conveyed to Ms. Montesarchio that she was being unfairly targeted because of her caretaking responsibilities for her father and children. She further expressed serious concerns about retaliation from Ms. Abreu, citing the pattern of increased scrutiny and disciplinary actions following her legally protected absences. Recognizing the risk of further mistreatment, Ms. Solla requested that the conversation remain confidential.

62. Ms. Solla provided specific examples of discrimination, including Ms. Abreu's repeated criticisms of her need to take time off to care for her children and father. She also reiterated Ms. Abreu's troubling statement in her six-month performance review, where Ms. Abreu remarked that had she known how complicated Plaintiff's family life was, she probably would not have hired her. This comment demonstrates a clear bias against Plaintiff's status as a caregiver and suggests that Defendants viewed her family responsibilities as an inconvenience rather than a protected right.

63. Negative performance reviews only began after Plaintiff exercised her legal rights, including taking protected absences under state and federal law. This sudden shift in Defendants' treatment of Plaintiff, from a previously satisfactory employee to a target for unwarranted discipline, strongly indicates retaliatory intent.

64. On February 1, 2024, Ms. Abreu and Plaintiff engaged in a conversation regarding Plaintiff's childcare responsibilities. During this conversation, Ms. Abreu made a pointed remark, stating: "You are frustrated because you are doing everything in your power to sustain a solid household, and we are frustrated because it's affecting your work life." This statement framed Plaintiff's legitimate struggles as a burden on the company rather than a reality deserving of support or accommodation.

65. Plaintiff immediately felt dismissed and unsupported, as Ms. Abreu's comment lacked empathy, minimized the difficulties of single parenthood and caregiving, and reinforced

the notion that Plaintiff's family obligations were viewed as an inconvenience rather than a protected right. Defendants' consistent pattern of framing Plaintiff's legally protected absences and family responsibilities as workplace disruptions further underscores their discriminatory and retaliatory motives.

66. On February 14, 2024, Ms. Solla was issued final written warning paperwork related to her January 31, 2024, write-up, citing the following alleged infractions: (1) excessive absenteeism, (2) children in the workplace, (3) organizational deficiencies, including her tendency to arrive at work 15 minutes early, (4) requesting personal medical advice from providers, and (5) excessive cell phone usage. **Ex. 11_2024.02.14_Ms. Solla's rebuttal to the write-up_**

67. However, Plaintiff's detailed written rebuttal to the allegations—submitted the same day—directly refutes the validity and fairness of this final warning:

   i. Excessive absenteeism: Plaintiff documented that all of her absences were either protected under federal and state law (including FMLA and NYLL § 196-b), medically excused, or previously approved by Defendants' management. Defendants failed to distinguish between protected absences and unexcused ones, instead weaponizing Plaintiff's caregiving responsibilities as a pretext for discipline.

   ii. Children in the workplace: Plaintiff refuted this allegation by pointing out that Defendants had previously approved such instances and that other employees had brought their children to the workplace without facing disciplinary action. Defendants failed to provide any documentation or policies prohibiting this practice, demonstrating a selective enforcement of rules to target Plaintiff specifically.

   iii. Organizational skills and early arrival: Defendants inexplicably criticized Plaintiff for arriving 15 minutes early, a contradictory and unreasonable claim, as early arrival is typically viewed as a sign of reliability rather than a deficiency. This

   iv. further suggests that the write-up was not based on legitimate concerns about performance but rather a pretext for retaliation.

   v. Requesting personal medical advice from providers: Plaintiff explicitly challenged this allegation and demanded proof, asserting that she had never inappropriately sought medical advice beyond work-related patient care matters. The absence of any supporting evidence in her personnel file indicates this claim was baseless and used as another pretext to justify unwarranted disciplinary action. **Ex. 11_2024.02.14_Ms. Solla's rebuttal to the write-up_**

   vi. Excessive cell phone usage: Plaintiff's rebuttal emphasized that her phone use was strictly limited to necessary communication regarding her children's and father's

medical care, a responsibility Defendants were fully aware of. Defendants failed to provide any objective comparison showing that Plaintiff's phone use was excessive relative to other employees, further highlighting the targeted nature of this disciplinary action.

68. Plaintiff's detailed objections to the final written warning, combined with the lack of evidence supporting Defendants' allegations, demonstrate that this write-up was not a legitimate disciplinary measure but rather a retaliatory action taken in response to Plaintiff exercising her legal rights to protected leave and workplace accommodations.

69. On February 18, 2024 Ms. Solla sent a email to a Ms. Montesarchio , and  Michelle Torres (hereinafter "Ms. Torres , a Senior Director of Operations to the final write up noting that her 1) absenteeism was a direct result of her caretaking responsibilities of her children and father; 2) that her children being in the workplace was approved by Ms. Abreu and Dr. Cho; 3) Ms. Solla's organizational skills were critiqued on the grounds that she would arrive to work early, and was therefore unreasonable; 4) Ms. Solla requested a medical provider to prescribe her medication to avoid taking further time off from work as she was aware of the Defendants's concerns with her absenteeism; 5) Plaintiff conveyed that her cell phone usage was related to her childcare responsibilities and her responsibility to her father and her son's medical conditions. **EX. 12 2024.02.18_Ms. Solla´s rebuttal to the write up_**

70. On February 21, 2024, Plaintiff sent another email to Ms. Montesarchio and Ms. Torres, following up to receive a response regarding their comments on the write-up. **EX. 13 2024.02.21_Ms. Solla´s reminder about rebuttal to the write up_**

71. Later that same day, Ms. Montesarchio responded, stating that the information Plaintiff sent would be attached to the documentation in her HR file. Plaintiff replied, expressing that she was extremely upset about the situation, as the arguments in the write-up were unfounded, and requested an opportunity to speak with her. In response, Ms. Montesarchio assured her that she would review all the documents and that they would have a meeting to discuss them. Ms. Montesarchio also informed Plaintiff that Caitlin from HR had sent her the Paid Family Leave (PFL) and Family Medical Leave Act (FMLA) forms to determine her eligibility for leave. **EX. 14_ 2024.02.21_Ms. Montesarchio answer about Plaintiff rebuttal to the write up_**

72. On February 27, 2024, Plaintiff was still feeling extremely ill and went to a doctor's appointment at Northwell Health. The medical provider at Northwell health excused Ms. Solla from work until March 4, 2024. Ms. Solla provided a doctor's note substantiating her absences. **EX. 15_ 2024.02.27_Plaintiff's doctors note_**

73. In March 16, of 2024, Ms. Solla applied for FMLA to properly deal with her caretaking responsibilities for her father.

74. On April 5, 2024, Plaintiff was approved for FMLA leave on since May 16, 2024. The FMLA was approved until October 8, 2024. **EX. 16_ 2024.10.16_Plaintiff's FMLA approval_**

## DEFENDANTS' FMLA VIOLATIONS RETALIATION, PRETEXTUAL TERMINATION, AND PRIVACY BREACH

75. Ms. Solla is an American of Italian descent from an immigrant family. Throughout her life, she has been deeply connected to the Spanish-speaking community through her ex-husband, current partner, and children, all of whom are Latino. As a result, she is highly proficient in Spanish, a skill that was explicitly recognized during the hiring process as a valuable asset for communicating with Spanish-speaking clients and assisting as an interpreter when necessary.

76. Ms. Solla frequently communicated in Spanish with both patients and their family members who were not fluent in English.

77. She had never encountered any complaints regarding her use of Spanish at work. On the contrary, patients and their families consistently praised her for her ability to communicate with them in their native language.

78. In October 2023, receptionist Brittany asked Ms. Solla to assist a Spanish-speaking patient's mother. After the conversation ended, Ms. Solla casually remarked that learning English could help immigrants navigate daily life more easily. She then shared a personal story about her own immigrant parents, explaining how their efforts to learn English had helped them secure better opportunities in the U.S.

79. Brittany mischaracterized Ms. Solla's comments as racist and falsely portrayed her as a bigoted person. She then reported the incident to Ms. Abreu, claiming that Ms. Solla had made discriminatory remarks simply for discussing her family's immigrant experience and the benefits of learning English.

80. In response, Ms. Abreu confronted Ms. Solla, stating that her comments could be a terminable offense.

81. Ms. Solla was shocked and confused by this accusation, as she herself comes from an immigrant background, and her children are Puerto Rican on their father's side. She explained that her ex-husband, children, and current partner are Hispanic, making the accusation completely unfounded. Despite this, Ms. Abreu continued to insist that her alleged comments warranted termination.

82. No internal investigation was conducted regarding the incident, nor was there any effort made to clarify the situation. Ms. Abreu acted as both judge and jury, allowing the false accusations to go unchecked while portraying Ms. Solla as a racist.

83. Two weeks later, during a staff meeting, Ms. Abreu asked if anyone had anything to share. She then looked directly at Brittany, as if prompting her to speak. Brittany immediately accused Ms. Solla of being racist, publicly repeating the false allegation in front of the entire staff and further damaging her professional reputation.

84. During a formal meeting attended by Brittany, Dr. Cho, Ms. Abreu, and Ms. Solla, Brittany stated, in sum and substance, "You are a white woman. If you were in the Bronx, comments like that could be taken differently." Ms. Solla immediately questioned why her race was relevant to the discussion, emphasizing that the accusations against her were racially charged and baseless. Despite Brittany making direct racial remarks in front of supervisors, neither Dr. Cho nor Ms. Abreu took any action to address Brittany's conduct, nor did they initiate an internal investigation. No formal disciplinary measures were taken against either party, demonstrating that Defendants did not view the allegations as serious enough to warrant actual consequences.

85. Despite the public accusation, Defendants took no formal action against Ms. Solla, no official reprimand, no disciplinary review, and no follow-up investigation. The allegations were left unsubstantiated, yet they were used against her when convenient.

86. There is no record of any alleged racist conduct by Ms. Solla in her six-month performance review, that was conducted on November 2023, or in any formal employment documents.

87. Even on February 14, 2024, when Ms. Solla received a final written warning citing various alleged infractions, there was no mention of racism, racist comments, or complaints from coworkers about racial misconduct.

88. In April 2024, Ms. Solla had a private conversation with Ms. Abreu regarding her financial struggles as a single mother caring for a sick father. During the discussion, she expressed frustration over being ineligible for government assistance, while undocumented immigrants qualified for certain benefits. At no point did Ms. Solla mention race or ethnicity; her comments were solely focused on public policy and economic disparities.

89. In response, Ms. Abreu told Ms. Solla that she had "no business making comments about immigrants" because she was white and could not understand their struggles. She further asserted that, as a white woman, Ms. Solla was incapable of understanding her (Abreu's) experiences or those of Hispanic individuals in America.

90. In response, Ms. Solla explained that her parents were Italian immigrants and that she had deep personal ties to the Latino community through her ex-husband, children, and current partner. Despite this, Ms. Abreu dismissed Ms. Solla's background, reiterating that her race made her inherently incapable of understanding immigrant struggles.

15

91. On April 23, 2024, Ms. Solla attended a team meeting led by Ms. Abreu. Shortly afterward, Ms. Solla received an email summarizing the meeting, which outlined areas for improvement, including time management, communication with Brittany, and acknowledgment of progress in her most recent evaluation. Notably, this email did not reference any racial issues or allegations of misconduct. **EX. 17_ 2024.04.16_Plaintiff's FMLA approval_**

92. Only two days later, on April 26, 2024, despite being informed that she had shown improvement, Ms. Solla was abruptly terminated by Ms. Abreu and other management personnel.



Figure 3 Plaintiff Termination Letter.

93. When Ms. Solla asked for the reason behind her termination, Ms. Abreu explicitly stated that she was being fired because she was "a racist."

94. Ms. Solla immediately requested evidence supporting this claim, but Ms. Abreu was unable to produce any proof, further demonstrating that the accusation was fabricated.

95. The termination letter provided to Ms. Solla contradicted Ms. Abreu's stated reason for firing her—instead of citing alleged misconduct, it expressed appreciation for her contributions to the workplace and made no mention of racism.

96. In addition, Defendants included paperwork for unemployment benefits with Ms. Solla's termination documents, explicitly stating that they would not contest her claim—a highly inconsistent action for an employer terminating an employee for alleged racism.

97. To the contrary, the termination letter's language affirming Ms. Solla's value as an employee directly contradicts Defendants' claim that she was fired for racist behavior, further proving that this accusation was a pretext for an unlawful termination.

98. The real motivation for Ms. Solla's termination was her status as a caretaker for her father and children. Defendants repeatedly criticized her for taking legally protected absences and expressed frustration about her caregiving responsibilities.

99. Additionally, Ms. Abreu's documented statements show that she viewed Ms. Solla's race as disqualifying, stating that as a white woman, she had no right to speak on political issues in America, further demonstrating discriminatory animus.

100. On information and belief, the timing of Ms. Solla's termination, just two weeks before she was set to begin FMLA leave, strongly suggests that Defendants sought to terminate her to avoid accommodating her protected leave.

101. Ms. Solla's termination came shortly after she engaged in protected activity by filing formal complaints with HR regarding Ms. Abreu's discriminatory and hostile behavior. Additionally, Ms. Solla exercised her legally protected rights by requesting time off for caregiving responsibilities and medical-related absences, which were protected under the FMLA, ADA, and NYLL § 196-b.

102. Rather than taking corrective action, Defendants failed to mitigate the hostile work environment and instead escalated their retaliation, ultimately terminating Ms. Solla for engaging in protected activities, in clear violation of federal and state law.

103. Defendants discriminated against Plaintiff in violation of 42 U.S.C. § 12112(b)(4) of the Americans with Disabilities Act (ADA) by taking adverse employment actions against her due to her association with her disabled father. Defendants were fully aware of Plaintiff's father's disability and her role as his primary caregiver. Supervisors explicitly expressed concerns about her caregiving responsibilities, referring to them as an "unreasonable burden" on the company. Defendants penalized Plaintiff for requesting scheduling flexibility and retaliated against her through increased scrutiny, disciplinary actions, and eventual termination.

## FMLA VIOLATIONS AND UNLAWFUL DEMAND FOR PRIVATE MEDICAL RECORDS

104. On April 5, 2024, Ms. Solla's FMLA leave was officially approved, allowing her to take leave from May 16, 2024, through October 8, 2024 to care for her immunocompromised father. **EX. 17_ 2024.10.16_Plaintiff's FMLA approval_**

105. However, just two weeks before her leave was set to begin, Defendants abruptly terminated her employment, falsely claiming that she was a racist—an accusation they had never previously documented or investigated.

106. The sudden timing of Ms. Solla's termination, so close to the start of her FMLA leave, strongly suggests that Defendants' true motive was to prevent her from taking job-protected leave. This pattern of conduct, criticizing her for protected absences, increasing scrutiny of her work, and ultimately terminating her, aligns with classic FMLA interference and retaliation.

107. Further evidence of pretext is found in Defendants' termination letter, which expressed appreciation for her contributions, contained no mention of misconduct or racist behavior, and included unemployment benefits paperwork stating that Defendants would not contest her claim, a direct contradiction to the alleged basis for her firing.

108. As part of her FMLA request, Defendants improperly required Ms. Solla to submit her father's private medical records, despite federal law prohibiting such a request. When Ms. Solla questioned why she was being forced to disclose this highly sensitive information, Ms. Abreu insisted that it was "mandatory" for Defendants' records.

109. Under 29 C.F.R. § 825.500(g), employers are prohibited from demanding or maintaining an employee's family member's private medical records as part of an FMLA leave request. The law only permits an employer to require a basic healthcare provider certification, not detailed medical records.

110. Defendants' unlawful demand for medical records placed an undue burden on Ms. Solla, violated FMLA regulations, and further exemplifies Defendants' pattern of hostility toward her legally protected leave. Instead of processing her request in compliance with federal law, Defendants unlawfully intruded into her father's medical privacy and then terminated her weeks before her leave was set to begin.

## DEFENDANTS ALLEGATIONS BEFORE THE NEW YORK STATE UNEMPLOYMENT INSURANCE

111. In the termination letter provided to the Plaintiff, it was explicitly stated that she could apply for unemployment benefits. Additionally, Lizzy Chacko, Human Resources Assistant, personally assured the Plaintiff, stating, "Do not worry, you can apply for unemployment; we will not deny it." This assurance gave the Plaintiff a sense of security regarding her financial stability following the termination of her employment. **EX. 18_ 2024.04.26_Plaintiff's termination letter_**

112. Given her financial necessity and the fact that unemployment benefits were her sole source of income, the Plaintiff applied for unemployment benefits on April 27, 2024. She relied on the explicit assurance given by her employer that her claim would not be contested. This application was a necessary step to ensure financial survival for herself and her household.

113. On May 1, 2024, Plaintiff Solla received a document from the Department of Labor (DOL) stating that they had been informed she had been terminated from her

employment with the Defendants. The document requested additional information regarding the circumstances of her termination. In response, Ms. Solla provided the necessary details and attached the termination letter issued by the Defendants. **EX. 19_ 2024.01_Plaintiff's response to the DOL letter_**

114. On May 13, 2024, the Plaintiff received a letter from the DOL informing her that her claim for unemployment benefits had been denied. The stated reason for the denial was that "you made inappropriate racial comments to a coworker about a patient. You were expected not to do this. You knew or should have known that your actions would jeopardize your job." **EX. 20_ 2024.05.13_Plaintiff's denial of unemployment_**

115. This response was both surprising and alarming to the Plaintiff for several reasons: she had been explicitly assured by the employer that her application for unemployment would not be contested, her termination letter made no mention of any alleged "racist comments" as grounds for her dismissal. This inconsistency raises serious questions regarding the credibility and motives of the employer in providing such contradictory information.

116. Ms. Solla's termination occurred during the period in which she was in the process of applying for leave under the FMLA. Throughout this process, the employer had expressed strong concerns about her caregiving responsibilities for both her father and her son. This context strongly suggests that the proffered reason for her termination was merely a pretext designed to conceal the real motive: retaliation against her for attempting to exercise her right to a federally protected benefit. Furthermore, the absence of any reference to "racist comments" in the termination letter underscores the fabricated nature of the employer's claim. If such a serious allegation had been the actual basis for termination, it would have been clearly documented in the termination notice to protect the employer from potential future liability.

117. In fact, the termination letter states, "Your contributions to the office are greatly appreciated.". This statement is entirely inconsistent with the notion that the Plaintiff was fired for misconduct, let alone an egregious offense such as making racist remarks.

118. The failure to document such a reason in the termination letter is highly suspect, especially given the legal implications of maintaining accurate employment records. Employers are required to document termination reasons truthfully and transparently, particularly when misconduct is alleged.

119. Despite the Defendants' misleading claims, Plaintiff Solla decided to appeal the DOL's decision, challenging the false statements submitted by the Defendants. She was determined to fight against the fabricated allegations that had unjustly disqualified her from receiving unemployment benefits.

120. On October 15, 2025, Administrative Law Judge Leonard Shapiro granted her appeal due to the Defendants' failure to appear at the hearing or provide any supporting

evidence for their allegations. The final ruling stated:"The initial determination disqualifying the claimant from receiving benefits effective April 27, 2024, on the basis that the claimant lost employment through misconduct in connection with that employment and holding that the wages paid to the claimant by BOSTON CHILDREN'S HEALTH prior to April 27, 2024, cannot be used toward the establishment of a claim for benefits is overruled. The claimant is allowed benefits with respect to the issues decided herein." **EX. 21 2024.10.15_Plaintiff's approval of unemployment benefit_**

121. This ruling serves as unequivocal evidence that the Defendants intentionally submitted a false claim to the DOL with the sole purpose of obstructing Plaintiff Solla's access to unemployment benefits. The Defendants' conduct in this matter further substantiates the claim that the true reason for her termination was not any alleged misconduct, but rather her status as a caretaker.

122. This case highlights a blatant act of employer retaliation and misrepresentation, warranting further legal scrutiny and accountability.

## FIRST CAUSE OF ACTION
Associational Discrimination
Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., 42 U.S.C. § 12112(b)(4)

123. Every fact alleged herein is repeated, re-alleged, and incorporated as though fully set forth herein.

124. The provisions of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., applied to the Defendants and protected the Plaintiff while Plaintiff worked for the Defendants.

125. The Americans with Disabilities Act, 42 U.S.C. § 12112(b)(4), prohibits an employer like Defendants from discriminating against employees like Plaintiff because of their known association with an individual with a disability.

126. The Defendants subjected Plaintiff to disparate treatment, heightened scrutiny, and adverse employment actions because of her association with her disabled father, who suffered from multiple severe medical conditions, including liver transplant complications, cancer, and pulmonary hypertension.

127. By the Defendants' unlawful discrimination against Plaintiff due to her association with a disabled individual, they violated 42 U.S.C. § 12112(b)(4) of the Americans with Disabilities Act.

128. As a result of the unlawful conduct described herein, Plaintiff suffered economic losses, emotional distress, reputational harm, and other damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

Associational Hostile Work Environment

Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., 42 U.S.C. § 12112(b)(4)

129. Every fact alleged herein is repeated, re-alleged, and incorporated as though fully set forth herein.

130. The provisions of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., applied to the Defendants and protected the Plaintiff while Plaintiff worked for the Defendants.

131. The Americans with Disabilities Act, 42 U.S.C. § 12112(b)(4), prohibits an employer like Defendants from subjecting employees like Plaintiff to a hostile work environment because of their known association with an individual with a disability.

132. The Defendants created a hostile work environment by subjecting Plaintiff to repeated criticism, undue scrutiny, and discriminatory remarks related to her caregiving responsibilities for her disabled father.

133. Defendants openly questioned Plaintiff's ability to perform her job due to her caregiving obligations and made disparaging remarks, including stating, "Had we known your home life situation was so bad, Dr. Cho would have reconsidered hiring you."

134. Defendants' conduct created a pervasive and hostile work environment, making it increasingly difficult for Plaintiff to perform her job duties without fear of retaliation or further mistreatment.

135. By the Defendants' unlawful creation of a hostile work environment due to Plaintiff's association with a disabled individual, they violated 42 U.S.C. § 12112(b)(4) of the Americans with Disabilities Act.

136. As a result of the unlawful conduct described herein, Plaintiff suffered economic losses, emotional distress, reputational harm, and other damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

Associational Retaliation

Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., 42 U.S.C. § 12203

137. Every fact alleged herein is repeated, re-alleged, and incorporated as though fully set forth herein.

138. The provisions of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., applied to the Defendants and protected the Plaintiff while Plaintiff worked for the Defendants.

21

139. The Americans with Disabilities Act, 42 U.S.C. § 12203, prohibits an employer like Defendants from retaliating against employees like Plaintiff for opposing discriminatory practices or asserting rights related to the care of a disabled individual.

140. The Defendants retaliated against Plaintiff for requesting legally protected accommodations and for complaining about the discriminatory treatment she experienced due to her caregiving responsibilities.

141. Defendants increased scrutiny of Plaintiff, issued unwarranted disciplinary actions, and ultimately terminated her under false pretenses just weeks before her approved FMLA leave was set to begin.

142. By the Defendants' unlawful retaliation against Plaintiff due to her association with a disabled individual and her opposition to discriminatory practices, they violated 42 U.S.C. § 12203 of the Americans with Disabilities Act.

143. As a result of the unlawful conduct described herein, Plaintiff suffered economic losses, emotional distress, reputational harm, and other damages in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
Associational Failure to Accommodate
Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., 42 U.S.C. § 12112(b)(5)

144. Every fact alleged herein is repeated, re-alleged, and incorporated as though fully set forth herein.

145. The provisions of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., applied to the Defendants and protected the Plaintiff while Plaintiff worked for the Defendants.

146. The Americans with Disabilities Act, 42 U.S.C. § 12112(b)(5), prohibits an employer like Defendants from failing to provide reasonable accommodations to employees like Plaintiff when their request is related to their association with a disabled individual.

147. The Defendants failed to provide reasonable accommodations to Plaintiff despite knowing that she was the sole caregiver for her disabled father, who required intensive medical care, medication management, and frequent doctor's visits.

148. Plaintiff requested reasonable flexibility for her federally protected absences to care for her father, but Defendants instead penalized her, subjected her to scrutiny, and ultimately terminated her rather than accommodating her requests.

149. By the Defendants' unlawful failure to accommodate Plaintiff's need for flexibility due to her association with a disabled individual, they violated 42 U.S.C. § 12112(b)(5) of the Americans with Disabilities Act.

150. As a result of the unlawful conduct described herein, Plaintiff suffered economic losses, emotional distress, reputational harm, and other damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (FMLA Interference)
### (29 U.S.C.A. § 2615)

151. Every fact alleged herein is repeated, re-alleged and incorporated as though fully set forth herein.

152. Under the FMLA, 29 U.S.C.A. § 2615, It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

153. Plaintiff applied for FMLA leave in March 16 of 2024 and was granted FMLA leave on April 5th, 2024, with a start date of May 16, 2024.

154. Defendants interfered with Plaintiff's attempt to take FMLA leave by terminating her employment on April 26, 2024, just 11 days after attempting to exercise her rights under the FMLA, and before she was able to take her leave on May 16, 2024.

155. Plaintiff suffered harm because of the Defendants's unlawful retaliatory and discriminatory conduct as set forth herein.

156. Due to Defendants's violations, Plaintiff Solla is entitled to recover lost wages, compensatory damages, punitive damages, reasonable attorney's fees, expenses, and the costs of the action, and pre-judgment and post-judgment interest from the Defendants.

## SIXTH CAUSE OF ACTION
### (FMLA Discrimination/Retaliation)
### (29 U.S.C.A. § 2615)

157. Every fact alleged herein is repeated, re-alleged and incorporated as though fully set forth herein.

158. It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

159. Under the FMLA, an employer is required to notify an employee when they know or should have known an employee is eligible for an FMLA qualifying event.

160. Ms. Solla notified Defendants of her father's serious health condition numerous times, including at her initial interview.

161. Plaintiff notified Defendants's numerous times of FMLA qualifying events as relate to her father serious health condition.

23

162. Ms. Solla opposed the discrimination she was facing based on her status of a caretaker by conveying to Defendants's HR director Ms. Montesarchio that she feared Ms. Abreau was going to terminate her because of her responsibilities as a caretaker for her children and father.

163. Plaintiff suffered harm because of the Defendants's unlawful retaliatory and discriminatory conduct, including her termination as set forth herein.

164. Due to Defendants's violations, Plaintiff Solla is entitled to recover lost wages, compensatory damages, punitive damages, reasonable attorney's fees, expenses, and the costs of the action, and pre-judgment and post-judgment interest from the Defendants.

### SEVENTH CAUSE OF ACTION
Associational Discrimination
New York State Human Rights Law, N.Y. Exec. Law § 296

165. Every fact alleged herein is repeated, re-alleged, and incorporated as though fully set forth herein.

166. The provisions of the New York State Human Rights Law (NYSHRL), N.Y. Exec. Law § 296, applied to the Defendants and protected the Plaintiff while Plaintiff worked for the Defendants.

167. The NYSHRL prohibits an employer like Defendants from discriminating against employees like Plaintiff because of their known association with an individual with a disability.

168. The Defendants subjected Plaintiff to disparate treatment, heightened scrutiny, and adverse employment actions because of her association with her disabled father, who suffered from multiple severe medical conditions, including liver transplant complications, cancer, and pulmonary hypertension.

169. Defendants openly questioned Plaintiff's ability to perform her job due to her caregiving responsibilities and made discriminatory remarks about her home life being a liability to the company.

170. By the Defendants' unlawful discrimination against Plaintiff due to her association with a disabled individual, they violated N.Y. Exec. Law § 296.

171. As a result of the unlawful conduct described herein, Plaintiff suffered economic losses, emotional distress, reputational harm, and other damages in an amount to be determined at trial.

### EIGHTH CAUSE OF ACTION
Associational Hostile Work Environment
New York State Human Rights Law, N.Y. Exec. Law § 296

172. Every fact alleged herein is repeated, re-alleged, and incorporated as though fully set forth herein.

173. The provisions of the New York State Human Rights Law (NYSHRL), N.Y. Exec. Law § 296, applied to the Defendants and protected the Plaintiff while Plaintiff worked for the Defendants.

174. The NYSHRL prohibits an employer like Defendants from subjecting employees like Plaintiff to a hostile work environment because of their known association with an individual with a disability.

175. The Defendants created a hostile work environment by subjecting Plaintiff to repeated criticism, undue scrutiny, and discriminatory remarks related to her caregiving responsibilities for her disabled father.

176. Defendants failed to take any action to address the hostile work environment and instead engaged in conduct that exacerbated it, including making remarks implying that Plaintiff's home life made her a burden to the company.

177. Defendants' conduct made it increasingly difficult for Plaintiff to perform her job duties without fear of retaliation or further mistreatment.

178. By the Defendants' unlawful creation of a hostile work environment due to Plaintiff's association with a disabled individual, they violated N.Y. Exec. Law § 296.

179. As a result of the unlawful conduct described herein, Plaintiff suffered economic losses, emotional distress, reputational harm, and other damages in an amount to be determined at trial.

## NINTH CAUSE OF ACTION

Associational Retaliation

New York State Human Rights Law, N.Y. Exec. Law § 296

180. Every fact alleged herein is repeated, re-alleged, and incorporated as though fully set forth herein.

181. The provisions of the New York State Human Rights Law (NYSHRL), N.Y. Exec. Law § 296, applied to the Defendants and protected the Plaintiff while Plaintiff worked for the Defendants.

182. The NYSHRL prohibits an employer like Defendants from retaliating against employees like Plaintiff for opposing discriminatory practices or asserting rights related to the care of a disabled individual.

183. The Defendants retaliated against Plaintiff for requesting legally protected accommodations and for complaining about the discriminatory treatment she experienced due to her caregiving responsibilities.

184. Defendants escalated their retaliation by increasing scrutiny of Plaintiff, issuing unwarranted disciplinary actions, and ultimately terminating her under false pretenses just weeks before her approved FMLA leave was set to begin.

185. By the Defendants' unlawful retaliation against Plaintiff due to her association with a disabled individual and her opposition to discriminatory practices, they violated N.Y. Exec. Law § 296.

186. As a result of the unlawful conduct described herein, Plaintiff suffered economic losses, emotional distress, reputational harm, and other damages in an amount to be determined at trial.

**TENTH CAUSE OF ACTION**
Associational Failure to Accommodate
New York State Human Rights Law, N.Y. Exec. Law § 296

187. Every fact alleged herein is repeated, re-alleged, and incorporated as though fully set forth herein.

188. The provisions of the New York State Human Rights Law (NYSHRL), N.Y. Exec. Law § 296, applied to the Defendants and protected the Plaintiff while Plaintiff worked for the Defendants.

189. The NYSHRL prohibits an employer like Defendants from failing to provide reasonable accommodations to employees like Plaintiff when their request is related to their association with a disabled individual.

190. The Defendants failed to provide reasonable accommodations to Plaintiff despite knowing that she was the sole caregiver for her disabled father, who required intensive medical care, medication management, and frequent doctor's visits.

191. Plaintiff requested reasonable flexibility for her federally protected absences to care for her father, but Defendants instead penalized her, subjected her to scrutiny, and ultimately terminated her rather than accommodating her requests.

192. By the Defendants' unlawful failure to accommodate Plaintiff's need for flexibility due to her association with a disabled individual, they violated N.Y. Exec. Law § 296.

193. As a result of the unlawful conduct described herein, Plaintiff suffered economic losses, emotional distress, reputational harm, and other damages in an amount to be determined at trial.

**ELEVENTH CAUSE OF ACTION**
Retaliation
New York Labor Law § 215

194. Every fact alleged herein is repeated, re-alleged, and incorporated as though fully set forth herein.

195. The provisions of New York Labor Law (NYLL) § 215 applied to the Defendants and protected the Plaintiff while Plaintiff worked for the Defendants.

196. NYLL § 215 prohibits an employer like Defendants from retaliating against employees like Plaintiff for exercising their rights under New York labor laws, including taking legally protected leave and filing complaints about unlawful employment practices.

197. Plaintiff engaged in protected activity by requesting and taking leave for caregiving responsibilities protected under NYLL § 196-b, by formally complaining to Human Resources about workplace discrimination and retaliation, and by asserting her rights under the FMLA.

198. In response to Plaintiff's protected activity, Defendants retaliated against her by subjecting her to increased scrutiny, issuing baseless disciplinary actions, making discriminatory comments about her caregiving obligations, and ultimately terminating her employment under false pretenses just weeks before she was set to take her approved leave.

199. Defendants further retaliated against Plaintiff by making false statements to the New York State Department of Labor in an effort to deny her unemployment benefits, despite previously assuring her that they would not contest her claim.

200. By the Defendants' unlawful retaliation against Plaintiff for exercising her rights under New York labor laws, they violated NYLL § 215.

201. As a result of the unlawful conduct described herein, Plaintiff suffered economic losses, emotional distress, reputational harm, and other damages in an amount to be determined at trial.

## TWELFTH CAUSE OF ACTION
False Statement to the New York Department of Labor
New York Labor Law § 632(2)

202. Every fact alleged herein is repeated, re-alleged, and incorporated as though fully set forth herein.

203. The provisions of New York Labor Law (NYLL) § 632(2) applied to the Defendants and protected the Plaintiff while Plaintiff worked for the Defendants.

204. NYLL § 632(2) prohibits an employer from making false statements or representations to the New York State Department of Labor (DOL) in connection with an employee's claim for unemployment benefits.

205. Defendants knowingly submitted false information to the DOL in an effort to deny Plaintiff's rightful unemployment benefits. Despite assuring Plaintiff at the time of

termination that she was eligible for unemployment and that they would not contest her claim, Defendants later falsely alleged to the DOL that Plaintiff had been terminated for making racist comments, despite the fact that her termination letter made no mention of such allegations.

206. Defendants' false statements were a deliberate effort to prevent Plaintiff from receiving the financial assistance to which she was entitled, further compounding the harm caused by her unlawful termination.

207. By knowingly making false statements to the DOL to interfere with Plaintiff's unemployment benefits, Defendants violated NYLL § 632(2).

208. As a result of the unlawful conduct described herein, Plaintiff suffered economic losses, reputational harm, and emotional distress, and is entitled to damages in an amount to be determined at trial.

## THIRTEENTH CAUSE OF ACTION
Aiding and Abetting
New York Executive Law § 296(6)
*Asserted by Plaintiff against Defendant Villucci*

209. Every fact alleged herein is repeated, re-alleged, and incorporated as though fully set forth herein.

210. The provisions of New York Executive Law § 296(6) applied to Defendant Gerard Villucci and protected the Plaintiff while Plaintiff worked for the Defendants.

211. New York Executive Law § 296(6) prohibits any person from aiding, abetting, inciting, compelling, or coercing an unlawful discriminatory or retaliatory act under the New York State Human Rights Law.

212. Defendant Villucci, as the CEO of Boston Children's Health Physicians, had authority over Plaintiff's employment and was directly involved in the decision to terminate her.

213. Defendant Villucci was aware of Plaintiff's legally protected leave under the FMLA and NYLL § 196-b, as well as her formal complaints about discrimination and retaliation. Despite this knowledge, Defendant Villucci failed to intervene and instead approved or condoned the discriminatory and retaliatory actions taken against Plaintiff.

214. Defendant Villucci further aided and abetted the unlawful termination of Plaintiff by permitting and endorsing the use of pretextual reasons to justify her firing, knowing that the accusations against her were false and that her termination was motivated by discriminatory and retaliatory animus.

215. By aiding and abetting Defendants' unlawful discrimination and retaliation against Plaintiff, Defendant Villucci violated New York Executive Law § 296(6).

216. As a result of the unlawful conduct described herein, Plaintiff suffered economic losses, emotional distress, reputational harm, and other damages in an amount to be determined at trial.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Fed. R. Civ. P., Plaintiff demands a trial by jury on all questions of fact raised by this Plaintiff.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff seeks all available remedies available under all causes of action listed herein in this Plaintiff and any and all remedies that the Court deems just and proper. Including but not limited to All lost wages and benefits, front pay, pre-judgment and post-judgment interest; liquidated damages, punitive damages, statutory penalties; emotional distress damages; recovery of reasonable costs, attorney fees, and expenses; equitable relief, and any other relief considered just and proper.

Dated: White Plains, New York

February 14, 2025

EL-HAG & ASSOCIATES, PC

By: _Jordan El-Hag_

Jordan El-Hag, Esq.

777 Westchester Ave., Ste. 101

White Plains, NY 10604

(914) 218-6190 (o)

Jordan@elhaglaw.com